## UNION PACKING CO. v. ROGAN.
### No. 1071.

District Court, S. D. California, C. D.
Jan. 21, 1937.

Benjamin W. Shipman, of Los Angeles, Cal., for plaintiff.

Peirson M. Hall, U. S. Atty., and Francis C. Whelan, Asst. U. S. Atty., both of Los Angeles, Cal., for defendant.

YANKWICH, District Judge.

The Revenue Act of 1936, in title 3 (sections 501–506 [26 U.S.C.A. §§ 345–345e]), headed "Tax on Unjust Enrichment," provides for the collection of taxes on net income from certain specified sources. The taxes to be levied are:

"(1) A tax equal to 80 per centum of that portion of the net income from the sale of articles with respect to which a Federal excise tax was imposed on such person but not paid which is attributable to shifting to others to any extent the burden of such Federal excise tax and which does not exceed such person's net income for the entire taxable year from the sale of articles with respect to which such Federal excise tax was imposed.

"(2) A tax equal to 80 per centum of the net income from reimbursement received by such person from his vendors of amounts representing Federal excise-tax burdens included in prices paid by such person to such vendors, to the extent that such net income does not exceed the amount of such Federal excise-tax burden which such person in turn shifted to his vendees.

"(3) A tax equal to 80 per centum of the net income from refunds or credits to such person from the United States of Federal excise taxes erroneously or illegally collected with respect to any articles, to the extent that such net income does not exceed the amount of the burden of such Federal excise·taxes with respect to such articles which such person shifted to others." Section 501 (a), 26 U.S.C.A. § 345 (a).

The provisions do not apply to any articles not sold prior to the termination of the federal excise tax, nor if an adjustment has been made with respect to the article with the vendee, nor if, under the terms of any statute, the taxpayer would have been entitled to a refund from the United States of the federal excise tax with respect to the article. The remainder of section 501 need not concern us as it deals merely with the definition of net and gross income and with deductions.

By section 502 (26 U.S.C.A. § 345a) it is provided that the taxpayer shall be credited against the taxes so imposed any excess of the amount of other federal income and excess profit taxes payable by him for the taxable year over the amount of such other federal income and excess profit taxes which would have been payable by him for the taxable year, if his net income were decreased by the amount of net income taxable under this title. The administrative provisions, which are contained in section 503 (26 U.S.C.A. § 345b), make all the provisions of law (including penalties) relating to other income taxes applicable to this title, with certain exceptions. *This makes available to the taxpayer aggrieved under this title all the rights as to refunds for overpayment, including section 322 of the same act (26 U. S.C.A. § 322).* Every taxpayer upon whom a federal excise tax was imposed but not paid or who received any reimbursement or refund or credit of the federal excise tax is required to make a return containing such information as the Commissioner, with the approval of the Secretary of the Treasury, shall prescribe. The return must be filed, and the total of the taxes paid, not later than the fifteenth day of the third month after the date of the enactment of the act. Extensions may be granted for a period, not exceeding three years, if the Commissioner finds that the payment would constitute a hardship. The taxes imposed apply only to taxable years ending during the calendar year 1935 and subsequent taxable years. The United States Treasury Department, Bureau of Internal Revenue, in "Regulations 95" has promulgated regulations governing the reports to be made for taxes under this title.

The plaintiff, Union Packing Company, a California corporation, engaged in the business, among other things, of packing and curing hog products, with its principal place of business in Los Angeles county,

Cal., in a "Bill of Complaint and petition for declaratory judgment and injunctive relief," has attacked the validity of this enactment.

In substance, the bill alleges that the plaintiff was subject to the processing tax of the Agricultural Adjustment Act, as amended, 7 U.S.C.A. § 601 et seq. before it was declared invalid. On June 29, 1935, it instituted an action to enjoin the collection of the processing tax under it against the defendant in which a temporary injunction was secured, which later, on August 8, 1935, was changed into a preliminary injunction, which enjoined the defendant from all attempts to assess or levy the processing tax under the act. Later, the injunction was dissolved. Upon application to the Circuit Court of Appeals for the Ninth Circuit [Merchants Packing Co. v. Rogan, 79 F.(2d) 1], an injunction was issued similar to the one which had been granted to the plaintiff on August 8, 1935. During the pendency of the action, undertakings were filed by the plaintiff guaranteeing the payment of the taxes, which, up to the first of November, amounted to $38,142.68. If the act had been valid, it would have been liable for the additional sum of $17,906.91 up to January 6, 1936, making the total liability, had the Agricultural Adjustment Act been declared valid, $56,049.59. After the decision of the Supreme Court in United States v. Butler (1936) 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, upon motion, the plaintiff's security was released and exonerated by the court, which, at the same time, released the plaintiff from the payment of any additional amount which would have been assessed and levied against it had not the Agricultural Adjustment Act been declared invalid.

By virtue of these facts, the plaintiff comes under the provisions of title 3 of the Revenue Act of 1936.

Two taxable years of the plaintiff are affected by the act, the taxable years ending December 31, 1935, and December 31, 1936. The plaintiff challenges the tax upon the ground that it is imposed upon a class only, is not an income tax, is a direct tax not apportioned among the several states, is confiscatory, attempts to nullify the judgment of the Supreme Court in United States v. Butler, supra, through an attempt of Congress to validate and reimpose the taxes so invalidated, is a penalty, and an ex post facto law.

As a separate ground for the intervention of equity, plaintiff alleges that the processing tax it paid became a part of the cost of some of the products which it sold, and that its relief from such tax will be given effect in its ordinary income tax return. It never attempted, the bill continues, to segregate in fixing its cost price, the processing tax from other costs, but attempted to sell its goods in the open market, in competition with others, at a fair profit, and made no separate charge or addition to the selling price to cover the processing tax. The object of the act, the bill charges, is to recapture the levied portion of the processing taxes outlawed by the Supreme Court. In attempting to compute it, the plaintiff would have to calculate the net income and the amount of the processing tax shifted to others. This it cannot do, except upon an arbitrary assumed basis, there being no definite basis in the act. In doing this, the plaintiff would have to compute and furnish to the Commissioner information relating to the processing tax, as if it had not been declared invalid. As the processing tax applies only to products made prior to January 6, 1936, the plaintiff has kept its records without any anticipation or thought that any tax of this type would be levied. After reciting the penalties to be incurred in case of nonpayment, it is charged that plaintiff has no remedy at law, as no method of refund is provided in title 3 of the act, and there is no appropriation of funds by the Congress to cover refunds. Injunctive relief is asked and a declaration, under the Declaratory Judgments statute (Jud. Code, § 274d, as amended, 28 U.S.C.A. § 400), that the act is invalid as violative of the due process clause of the Constitution.

The government has moved to dismiss the bill for want of equity and lack of jurisdiction to render a judgment under the Declaratory Judgments Act.

We consider first the constitutionality of the act.

By the Sixteenth Amendment to the Constitution of the United States, the Congress was given power "to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several states, and without regard to any census or enumeration."

Income within the meaning of this amendment is "the fruit that is born of capital," "it is income as the word is known in the common speech of men." United

States v. Safety Car Heating Co. (1936) 297 U.S. 88, 99, 56 S.Ct. 353, 358, 80 L.Ed. 500. The power to tax income has always existed in the Congress. The amendment merely removed the necessity for apportionment of taxes on income among the states. Brushaber v. Union Pacific R. R. Co. (1916) 240 U.S. 1, 36 S.Ct. 236, 60 L. Ed. 493, L.R.A.1917D, 414, Ann.Cas.1917B, 713; Peck & Co. v. Lowe (1918) 247 U.S. 165, 38 S.Ct. 432, 62 L.Ed. 1049; Bowers v. Kerbaugh-Empire Co. (1926) 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886. In determining the validity of any tax, income, or other, the relation between the exercise of the taxing power and the Fifth Amendment comes into play often. The due process clause of that amendment is not a limitation upon the taxing power of the Congress except in what the Supreme Court has called "rare and special instances." A. Magnano Co. v. Hamilton (1934) 292 U.S. 40, 44, 54 S.Ct. 599, 601, 78 L.Ed. 1109.

These instances involve cases where the tax is "so arbitrary and capricious as to cause it to fall" before that clause. Tyler v. United States (1930) 281 U.S. 497, 50 S.Ct. 356, 74 L.Ed. 991, 69 A.L.R. 758; and see, Brushaber v. Union Pacific R. R. Co. (1915) 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493, L.R.A.1917D, 414, Ann.Cas.1917B, 713; Heiner v. Donnan (1932) 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772. Tax statutes have been nullified, as within this class, when (1) they were, in effect, a fine or penalty imposed summarily, without a hearing (Lipke v. Lederer [1922] 259 U.S. 557, 42 S.Ct. 549, 66 L.Ed. 1061; Regal Drug Corp. v. Wardell [1922] 260 U.S. 386, 43 S.Ct. 152, 67 L.Ed. 318; Hill v. Wallace [1922] 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822; United States v. Constantine [1935] 296 U.S. 287, 56 S.Ct. 223, 80 L.Ed. 233) or (2) when the classification was so arbitrary as to have no relation to any special benefits derived by a particular group or clearly discriminatory as between persons in the same category (Nichols v. Coolidge [1927] 274 U.S. 531, 532, 47 S. Ct. 710, 71 L.Ed. 1184, 52 A.L.R. 1081; Brushaber v. Union Pacific R. R. Co., supra), or (3) when they established a conclusive presumption, either unrelated to any facts, or which the taxpayer was not allowed to controvert (Heiner v. Donnan, supra; Schlesinger v. Wisconsin [1926] 270 U.S. 230, 231, 46 S.Ct. 260, 70 L.Ed.

557, 43 A.L.R. 1224; Hoeper v. Tax Commission [1931] 284 U.S. 206, 52 S.Ct. 120, 76 L.Ed. 248).

Excluding these instances, the power of the Congress to tax is supreme within its sphere. And if legislation has some reasonable relation to the taxing power, it will not be stricken down by a searching inquiry into the motives which may have induced its enactment. United States v. Doremus (1919) 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493; A. Magnano Co. v. Hamilton (1934) 292 U.S. 40, 44, 54 S.Ct. 599, 601, 78 L.Ed. 1109.

In the realm of income taxation, the right of the Congress to classify is beyond challenge. And the rule which obtains in the matter of classification is that there be some reasonable foundation for it. For a review of the cases on classification, see the writer's dissent in Morf v. Ingels (D.C. 1936) 14 F.Supp. 922.

In applying the principle to taxation, courts have sustained, with the exceptions noted, the broadest and most varied exercise of the Congressional discretion in classifying for taxation purposes.

"The power of Congress," wrote Mr. Chief Justice Taft, in Barclay & Co. v. Edwards (1924) 267 U.S. 442, 450, 45 S. Ct. 348, 349, 69 L.Ed. 703, "in levying taxes is very wide and where a classification is made of taxpayers that is reasonable, and not merely arbitrary and capricious, the Fifth Amendment cannot apply. As this court said, speaking of the taxing power of Congress, in Evans v. Gore, 253 U.S. 245, 256, 40 S.Ct. 550, 554, 64 L.Ed. 887, 11 A.L.R. 519: 'It may be applied to every object within its range "in such measure as Congress may determine;" enables that body "to select one calling and omit another, to tax one class of property and to forbear to tax another;" and may be applied in different ways to different objects so long as there is "geographical uniformity" in the duties, imposts and excises imposed.'" (Italics added.)

At the basis of this rule of liberality lies the pragmatic fact that it is humanly impossible to establish a system of taxation which will not, in some respects, work more oppressively on one person or group of persons than on another. As stated by Judge Learned Hand in Cohan v. Commissioner of Internal Revenue (C.C.A.2, 1930) 39 F.(2d) 540, 545:

"It is notoriously *impossible nicely to adjust the weight of taxes, and it is no objection that upon occasion the result may disappoint reasonable anticipations.* The injustice is no greater than if a man chance to make a profitable sale in the months before the general rates are retroactively changed. Such a one may indeed complain that, could he have foreseen the increase, he would have kept the transaction unliquidated, but it will not avail him; he must be prepared for such possibilities, the system being already in operation. His is a different case from that of one who, when he takes action, has no reason to suppose that any transactions of the sort will be taxed at all.

"No doubt the difference is one of degree, but constitutional matters are generally that; *limitations like the Fifth Amendment are not like sailing rules, or traffic ordinances; they do not circumscribe the action of Congress by metes and bounds. Rather they are admonitions of fair dealing, whose disregard the courts will correct, if extreme and glaring.* Custom counts for much in such matters, and consistency for little; *men cannot hope to fit their doings in advance to a pattern which will be sure to endure.* The most they can expect is that courts will intervene when the defeat of their expectations passes any measure that reasonable persons could think tolerable, and even then their grievance must be fairly outside the zone of possible debate." (Italics added.)

And, see Spencer v. Merchant (1888) 125 U.S. 345, 8 S.Ct. 921, 31 L.Ed. 763; McCray v. United States (1904) 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561; Helvering v. City Bank Farmers' Trust Co., Trustee (1935) 296 U.S. 85, 56 S.Ct. 70, 80 L.Ed. 62; Helvering v. Helmholz (1935) 296 U.S. 93, 56 S.Ct. 68, 80 L. Ed. 76; White v. Poor (1935) 296 U.S. 98, 56 S.Ct. 66, 80 L.Ed. 80. Classifications have been upheld although they resulted in double taxation. Remco S. S. Co. v. Commissioner (C.C.A.9, 1936) 82 F.(2d) 988; 1 Paul & Mertens Law of Federal Taxation (1934) § 4.10.

■ In the process of classification, the Congress may give retroactive effect to a tax. Stockdale v. Atlantic Insurance Co. (1873) 20 Wall.(87 U.S.) 323, 22 L. Ed. 348; Brushaber v. Union Pacific Railway Co., supra; Lynch v. Hornby (1918) 247 U.S. 339, 38 S.Ct. 543, 62 L.Ed. 1149;

Cooper v. United States (1930) 280 U.S. 409, 50 S.Ct. 164, 74 L.Ed. 516; Milliken v. United States (1931) 283 U.S. 15, 51 S. Ct. 324, 75 L.Ed. 809; United States v. Hudson (1937) 57 S.Ct. 309, 81 L.Ed. ——, decided on January 11, 1937; Osburn California Corporation v. Welch (C.C.A.9, 1930) 39 F.(2d) 41, 42; Burnet v. Wells (1933) 289 U.S. 670, 53 S.Ct. 761, 77 L. Ed. 1439; Martz v. Commissioner (C.C.A. 9, 1936) 82 F.(2d) 110. In fact, one writer has pointed to the fact that up to and including 1934, nineteen income tax measures had been adopted by the Congress, every one of which had applied to income earned during the entire year in which the act was passed. Ballard, Retroactive Federal Taxation (1935); 48 Harvard Law Review, 592, 596; and see the dissenting opinion of Mr. Justice Brandeis in Untermyer v. Anderson (1928) 276 U.S. 440, 446, 48 S.Ct. 353, 354, 72 L.Ed. 645.

■ The act under discussion, when considered in the light of these principles, is valid.

Even if it be conceded that its object is to recapture excise taxes already assessed and which were returned to the taxpayer or not paid, it cannot be said to be arbitrary. The taxpayer is made to turn over to the government *not something which belongs to him,* but a tax which he has added to his cost, and *collected from others,* but *which was not collected from him.*

It is to be borne in mind that the majority of the Supreme Court in Butler v. United States (1936) 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, assumed the power of Congress of the United States to enact a processing tax. The reason the particular processing tax was invalidated was because the Congress had tied it to a system of control of agriculture. This, to the court, indicated an intention to control agriculture, *under the guise of taxation. The use* to which the tax was put determined its invalidity. The rationale of the majority opinion is contained in the following statement from Mr. Justice Stone's dissent:

"The constitutional power of Congress to levy an excise tax upon the processing of agricultural products *is not questioned.* The present levy is held invalid, *not for any want of power in Congress to lay such a tax to defray public expenditures,* including those for the general welfare, but

*because the use to which its proceeds are put is disapproved."* United States v. Butler, supra, 297 U.S. 1, at page 79, 56 S.Ct. 312, 325, 80 L.Ed. 477, 102 A.L.R. 914. (Italics added.)

Had the majority of the court been satisfied that the processing tax was *unrelated* to the system of agricultural control, which it considered beyond the power of the Congress, it never would have relieved the processors of it.

So, the Congress, upon the assumption that, while the processing tax was in existence, many of the processors "passed it" on to the consumer, and collected it, *for the use of the United States government,* has placed a special tax upon them aiming to tax a large portion of the taxes so collected by them from the public and to be paid but *actually not paid* to the government. Truly, the tax is, as named, "a tax on unjust enrichment". And enrichment, *not* at the expense of an individual, but at the expense of the buying public and the government which imposed the tax.

A tax so conceived has none of the earmarks of arbitrariness which would bring it under the interdict of the Fifth Amendment. See Kingan & Company, Inc., v. Smith (D.C.Ind.1936) 17 F.Supp. 217.

The recent decision of the Supreme Court in United States v. Hudson, 57 S.Ct. 309, 310, 81 L.Ed. ——, rendered on January 11, 1937, by a unanimous court, and which upheld the Silver Purchase Act of June 19, 1934 (48 Stat. 1178), seems to us to determine also the validity of the act we are considering.

There, as here, the Congress of the United States had enacted a *special* income tax, a tax in an amount of 50 per cent. on certain profits. The tax applied retroactively to profits out of certain special transactions only in silver. The opinion contains this significant statement:

"Thus *a profit* is made the occasion for the tax and *also the measure* of it." (Italics added.)

Here, too, we are confronted with a special income tax applicable to certain taxpayers who had, during two taxable years, *been made liable for, but did not pay* an excise tax and who shifted it to others. The collection of the tax depends upon proof that the tax was so shifted. If it was not, *the taxpayer is not liable.* The tax is not continuous. It extends only to the period during which excise taxes were payable. The tax so collected becomes a part of the revenue of the United States and goes into the general fund to be used for all governmental purposes.

■ There is no provision in the enactment that the moneys derived from it should be used in any attempt to exercise the control over agriculture which the Supreme Court struck down in United States v. Butler, supra, or any other agricultural control. The tax is simply a special income tax, levied upon a special group, for reasons best known to the Congress, in a percentage which the Congress deemed justified under the facts which it had before it. We cannot speculate upon motives and assume that the Congress intended, *in some way not apparent,* to nullify the decision of the Supreme Court and to achieve agricultural control indirectly.

The contention of the taxpayer here, in this respect, lacks substance, in view of the absence of any limitations upon the use of the money derived from this source and the limitation of the tax to two years. In passing upon legislative action in taxation matters, it is well to bear in mind the injunction of Mr. Justice Cardozo, speaking for the Supreme Court, in Burnet v. Wells (1933) 289 U.S. 670, 677, 53 S.Ct. 761, 764, 77 L.Ed. 1439:

"The controversy is one as to the boundaries of legislative power. It must be dealt with *in a large way,* as questions of due process always are, *not narrowly or pedantically, in slavery to forms or phrases."* (Italics added.)

The very basis of all systems of taxation is not only the need of taxation to the existence of government, but the more fundamental fact that the entire process of production out of which wealth of whatever nature arises is not individual, but social. As said by a well-known political scientist:

"A man's contribution as rent receiver, wage earner, interest taker, or profit-and-loss claimant, is not limited to that particular role. Simply as a consumer, a borrower, law-abiding citizen, a member of society, he constantly makes further contributions to economic production in forms that cannot be parcelled out and measured or evaluated specifically, by any natural law of wages, 'iron' or otherwise. He is simply a part of the whole of us who carry

on together the productive-consumptive process, which is essentially a collective process, and never in any instance an individual process. The corollary is that the total national product is the output of the whole nation, of the total situation (configuration, Gestalt) and belongs to the people as a whole. No individual is more, or less, than a trustee with respect to any part of it." Case, "Closing In On The Machine," (1935) 19 Sociology and Social Research, 216.

And if the Congress believes that a profit from a particular source, in the production of which the community has participated, was obtained under such circumstances as to amount to "unjust enrichment" by the standards of social or business conduct, as it conceives them, and taxes it heavily, courts have no right to say "Nay."

And this is true even if the taxing period were not limited, but the tax was continuous, aiming to tax a particular source, product, or business out of existence. A. Magnano Co. v. Hamilton, supra.

Confronted with profits arising out of collected but unpaid excise taxes, the Congress asked:

"Upon what meat doth this our Caesar feed

That he is grown so great?"

It could have enacted a new excise tax of definite rates, varying as to various processed goods, leaving out the control features which brought about the nullification of the old one, and made it retroactive, to cover the two-year period. In this manner, it could have taken all possible profits. Instead, it merely passed a special income tax, reaching a large portion of a definite profit, the portion which had been collected by persons engaged in certain occupations from others, assumedly, for the government, but not paid to it. It applied it to all within the group, thus making a valid classification. State Board of Tax Commissioners v. Jackson (1931) 283 U.S. 527, 51 S.Ct. 540, 75 L.Ed. 1248, 73 A.L.R. 1464.

Under this scheme, the taxpayer fares better than under a new excise tax applied retroactively. For he is required to pay only the amount which he has actually shifted to others, while under a new excise tax, he could have been made to pay a tax similar in amount to the old excise tax, based upon definite rate established by the Congress, without any relation to production control, whether he had actually shifted it to the consumer or not.

The attack on the tax upon constitutional grounds must, therefore, fail.

But assuming that the tax is unconstitutional, there are, nevertheless, certain principles, both of statutory and judicial origin, which stand in the way of granting injunctive relief against the taxing power of the government. It is the specific command of the Congress of the United States that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." Revised Statutes, § 3224, 26 U.S.C.A. § 1543. This command, which cannot be waived by agents of the government (Gouge v. Hart [D.C.Va.1917] 250 F. 802), by recent enactment, has been made to apply to declaratory judgments. The statute excepts specifically actual controversies "with respect to Federal taxes." Jud.Code, § 274d, as amended, 28 U.S.C.A. § 400.

Given the importance of the taxing power, courts, from our earliest history, acting upon general governmental and equitable principles, namely, the principle of noninterference (except in extreme cases) by the judicial arm of the government with the taxing power. As from the very beginning of government, some form of taxes had to be resorted to for its support (II Kings, 23:25; Acts, 5:37; Luke, 20:25) if, through the extraordinary writ of injunction, American courts were enabled to interfere with the taxing power, governmental activities might be crippled or even destroyed by being deprived of needed revenues. So we find an almost continuous application of the principle of noninterference to federal taxation by the Supreme Court. In Hannewinkle v. Mayor, etc., of Georgetown (1873) 15 Wall. 547, 548, 21 L.Ed. 231, the principle is stated succinctly:

"It has been the settled law of the country for a great many years, that an injunction bill to restrain the collection of a tax, on the sole ground of the illegality of the tax, cannot be maintained. There must be an allegation of fraud; that it creates a cloud upon the title; that there is apprehension of multiplicity of suits, or some cause presenting a case of equity jurisdiction."

It was stated in similar language in another leading case which preceded it. Dows v. Chicago (1870) 11 Wall. 108, 109, 20 L.Ed. 65. And it has been followed consistently since. State Railroad Tax Cases (1875) 92 U.S. 575, 23 L.Ed. 663; Union Pacific R. R. Co. v. Cheyenne (1885) 113 U.S. 516, 5 S.Ct. 601, 28 L.Ed. 1098; Milwaukee v. Koeffler (1886) 116 U.S. 219, 6 S.Ct. 372, 29 L.Ed. 612; Bailey v. George (1922) 259 U.S. 16, 42 S.Ct. 419, 66 L.Ed. 816; Miller v. Nut Margarine Co. (1932) 284 U.S. 498, 52 S.Ct. 260, 76 L.Ed. 422. Among the most recent cases in the Circuit Courts of Appeal in which the principle has been applied are: Fisher Flouring Mills Co. v. Vierhus (C.C.A.9, 1935) 78 F.(2d) 889; Regents of University System of Georgia v. Page (C.C.A. 5, 1936) 81 F.(2d) 577; Mellon v. Mertz (1936) 65 App.D.C. 266, 82 F.(2d) 872; Huston v. Iowa Soap Co. (C.C.A.8, 1936) 85 F.(2d) 649; Sheridan Flouring Mills, Inc., v. Cassidy (C.C.A.10, 1936) 87 F. (2d) 20, and in which the prohibition against suit was applied to the tax under attack here.

Absent the extraordinary and exceptional circumstances which make the statutory prohibition applicable, the courts have held that the remedy at law, through administrative methods providing for refunds, and actions at law for the recovery of the tax, after it is paid, is adequate. Port Angelus Western R. R. Co. v. Clallam County, Wash. (C.C.A.9, 1930) 44 F.(2d) 28. In this also the courts carry into effect the specific mandate of the Judicial Code that "suits in equity shall not be sustained in any court of the United States in any case where a plain, adequate, and complete remedy may be had at law." Jud. Code, § 267, 28 U.S.C.A. § 384. This prohibition governs proceedings in equity in federal courts and, unless waived by the parties, cannot be disregarded. Henrietta Mills v. Rutherford County (1930) 281 U.S. 121, 128, 50 S.Ct. 270, 272, 74 L.Ed. 737, and see Matthews v. Rodgers (1932) 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447.

And one of the objects of its enactment has been declared to be the preservation of the right of trial by jury, which might be destroyed if suits in equity could be instituted where an adequate remedy at law exists. Schoenthal v. Irving Trust Co. (1932) 287 U.S. 92, 53 S.Ct. 50, 77 L.Ed. 185; Enelow v. New York Life Insurance Co. (1935) 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440; and see Gelinas v. Buffum (C. C.A.9, 1931) 52 F.(2d) 598. Of course, the legal remedy must be as complete and as effective as the remedy at law. Boise Artesian Water Company v. Boise City (1909) 213 U.S. 276, 29 S.Ct. 426, 53 L.Ed. 796; Port Angelus Western R. R. Co. v. Clallam County, Wash., supra; Rieder v. Rogan (D.C.Cal.1935) 12 F.Supp. 307. Difficulty, nay, even *impossibility*, of proving the taxpayer's claim in a court of law does not amount to inadequacy of remedy. As said in Burnet v. Houston (1931) 283 U.S. 223, at page 228, 51 S.Ct. 413, 415, 75 L.Ed. 991:

"We cannot agree that the impossibility of establishing a specific fact, made essential by the statute as a prerequisite to the allowance of a loss, justifies a decision for the taxpayer based upon a consideration only of the remaining factors which the statute contemplates. The definite requirement of section 202 (a) (1) of the act [40 Stat. 1060] is not thus easily to be put aside. *The impossibility of proving a material fact upon which the right to relief depends simply leaves the claimant upon whom the burden rests with an unenforcible claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof.*" (Italics added.) And see United States v. Bitter Root Co. (1906) 200 U.S. 451, 26 S.Ct. 318, 50 L.Ed. 550.

*"Mere complication of facts alone and difficulty of proof are not a basis of equity jurisdiction."* Holmes, J., in Curriden v. Middleton (1914) 232 U.S. 633, 636, 34 S.Ct. 458, 459, 58 L.Ed. 765. (Italics added.)

The ruling of the Supreme Court in Rickert Rice Mills, Inc., v. Fontenot (1936) 297 U.S. 110, 56 S.Ct. 374, 80 L.Ed. 513, has not impaired the validity of these principles. Before deciding that case, the court had declared the Agricultural Adjustment Act unconstitutional in United States v. Butler, supra. It was called upon to determine what should be done with taxes assessed under it and which, pending the decision, had been deposited in court. It held that the processing tax provision of the Agricultural Adjustment Act being invalid, as being not a tax, but an attempt, under the guise of taxation, to control agriculture, the money impounded by the court belonged to the litigants. The rea-

son being, as stated by Mr. Justice Roberts:

"As yet the petitioner *has not paid* the taxes to the respondent, and, in view of the decision in the Butler Case, hereafter *cannot be required* so to do. If. the respondent should now attempt to collect the tax by distraint, *he would be a trespasser."* Rickert Rice Mills v. Fontenot, supra, 297 U.S. 110, at page 113, 56 S.Ct. 374, 375, 80 L.Ed. 513. (Italics added.)

*Here the tax is clearly a tax.* Assuming that it is unconstitutional, .the principles declared in the cases just discussed stand in the way of granting injunctive relief. Granted that the principle declared in Rickert Rice Mills v. Fontenot, supra, would apply to taxes which are, in reality, summary fines or penalties in the nature of punishments for criminal acts (Lipke v. Lederer [1922] 259 U.S. 557, 559, 42 S. Ct. 549, 550, 66 L.Ed. 1061; Regal Drug Corp. v. Wardell [1922] 260 U.S. 386, 43 S.Ct. 152, 67 L.Ed. 318), there is nothing in this tax which places it in either group.

Dogmatic allegations to that effect in the bill *do not* make it so. If the relief sought here is not available because the act under attack is not of the type involved in the cases of which we speak, neither can it be granted upon the basis of any extraordinary or exceptional circumstances. For the bill, a summary of which is given at the beginning of this opinion, *shows no such circumstances.*. At best, it shows that, through plaintiff's failure to keep books and accounts in a certain manner, it would be difficult to prove whether the tax was actually shifted to others. The .act provides alternative methods of computing the extent to which the burden was shifted (section 501 (e) (1, 2), 26 U.S.C.A. § 345 (e) (1, 2). In the realm of taxation, it is recognized that certain taxes are passed on to others. Section 424, subd. (a) (2), of the Revenue Act of 1928 (45 Stat. 866), made refunds of taxes paid by dealers in automobile accessories dependent upon proof "to the satisfaction" of the Commissioner that the tax "was not collected, directly or indirectly, from the purchaser or lessee, or that such amount, although collected from the purchaser or lessee, was returned to him." The provision was sustained in United States v. Jefferson Electric Co. (1934) 291 U.S. 386, 402, 54 S.Ct. 443, 449, 78 L.Ed. 859, the court saying:

"We do not perceive in the restriction *any infringement of due process of law. If the taxpayer has borne the burden of the tax, he readily can show it; and certainly there is nothing arbitrary in requiring· that he make such a showing.* If he has shifted the burden to the purchasers, they and not he have been the actual sufferers and are the real parties in interest; and in such a situation there is nothing arbitrary in requiring, as a condition to refunding the tax to him, that he give a bond to use the refunded money in reimbursing them." (Italics added.)

If the court could see no insuperable difficulty in a *positive* requirement upon which a refund of taxes already paid was made to depend as a condition precedent, we can see none in a *negative* requirement of a similar character upon which nonliability for taxes is made to rest.

To avoid any difficulty arising from any of the methods provided for computing the tax or the extent of.the shifting of the burden, flexible, alternative methods are provided in the act which are interpreted and applied with great liberality ·in the Regulations. Thus, for instance, the act allows the computation of the "margin" (that is, the difference between the "selling price" of articles and "cost"), which is a fundamental element in computing both the amount of the tax and the extent of the shifting of the burden. of the tax, on the basis of the "average margin." This is defined as:

"The average difference between the selling price ·and the cost of similar articles sold by the taxpayer during his six taxable years preceding the initial imposition of the Federal excise tax in question, except that if during any part of such six-year period the taxpayer was not.in business, or if his records for any part of such period are so inadequate as not to furnish satisfactory data, the average margin of the taxpayer for such part of such period shall, when necessary for a fair comparison, be deemed to be the average margin, as determined. by the Commissioner, of representative concerns engaged in a similar business and similarly circumstanced." Section 501 (f) (1), 26 U.S.C.A. § 345 (f) (1).

Under the regulations, the average. margin may also be computed as it appears from the taxpayer's own books covering a portion of the six-year period. The Com-

missioner may, upon audit, accept the determination or disapprove it and make another. Regulations 95, Art. 1 (2). Like flexibility is noticeable in the provisions relating to the computation of the shifting of the burden. Section 501 (e) (1, 2), 26 U.S.C.A. § 345 (e) (1, 2); Articles 13–15, Regulations.

Thus, the taxpayer is given, both in the act and the Regulations, variable criteria to adapt to his needs. Under them, he should have no difficulty in computing his tax or satisfying the Commissioner that he has borne the burden of the excise tax and should not pay the present tax.

It is easy to conjure imaginery difficulties arising out of *any* system of income taxation. But, ultimately, the answer to the fears, on this score, whether real or not, lies in the very terse truism of Mr. Justice Van Devanter, speaking for the court, in United States v. Jefferson Electric Co., supra: *"If the taxpayer has borne the burden of the tax, he readily can show it."* (Italics added.) If the taxpayer, notwithstanding the aid of the alternative methods in the act and in the Regulations, should still not be in the position to compute the tax, he can approximate it, as in other tax matters. He could make such return as under the facts in his particular case he can conscientiously make and take oath to. If the impossibility is so great that he actually cannot make any computation and he conscientiously believes that no tax is due from him, there is nothing to prevent him from making a "no tax" return. The Collector, then, would have it within his power to levy an assessment, after such discovery as he could make upon such examination of the taxpayer's books, papers, records, and memoranda bearing upon the return, as the law allows him to make. Revenue Act 1926, § 1104, as amended by Revenue Act 1928, § 618, 26 U.S.C.A. § 1514. If the taxpayer then paid it, clearly an action for overpayment or refund, through administrative channels, and, if unsuccessful, through the courts, would give him the opportunity of proving his contention that he is not subject to the tax because he did not "pass on" or shift the excise tax.

Again, there is no claim that the excise tax *was not* "passed on" by the taxpayer here. The sole claim, as we read the Bill, is that the taxpayer *cannot prove* that it *"did not pass it on,"* because of difficulties of bookkeeping and because it did not add the tax specifically to the sale cost of its processed products.

We are, therefore, confronted with the situation, recognized by the cases, that mere difficulty of proof *does not* make the remedy at law inadequate or entitle the taxpayer to resort to equity in matters of taxation. Burnet v. Houston, supra; Curriden v. Middleton, supra.

Nor has the plaintiff brought itself within any other of the situations which the courts have called either exceptional or extraordinary.

The action is brought by the taxpayer himself, and not by one of its stockholders to whom section 3224, Rev.St.(26 U.S.C. A. § 1543), does not apply. Pollock v. Farmers' Loan & Trust Co. (1895) 157 U. S. 429, 15 S.Ct. 673, 39 L.Ed. 759; Brushaber v. Union Pacific R. R. Co. (1916) 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493, L.R.A. 1917D, 414, Ann.Cas.1917B; 713.

Nor do we have circumstances, of the kind present in Miller v. Nut Margarine Co., supra, where the tax *did not* actually apply to the taxpayer's product. Or in Hill v. Wallace, supra, where the court was confronted with another regulation under the guise of a tax, which would have suspended, but for injunctive relief, all grain operations of the Chicago Board of Trade. Interpreting its ruling in that case, the Supreme Court said in Graham v. Du Pont (1923) 262 U.S. 234, 257, 43 S.Ct. 567, 570, 67 L.Ed. 965:

"It was a bill filed by members of the Chicago Board of Trade to prevent the governing board from applying to the Secretary of Agriculture to have the Board of Trade designated as a 'contract market' under the Future Trading Act (42 Stat. 187), on the ground that the act was unconstitutional and its operation would impair the value of the board to its members. *Without such designation, no member could have sold grain for future delivery without paying a prohibitive tax, and if he sold without paying the tax, he was subjected to heavy criminal penalties. To pay such a tax on each of the many thousands of transactions on the board, and to sue to recover them back, would have been utterly impracticable.* It would have blocked the entire future grain business of the country and would have seriously injured, not only the members of the board, but also the

944

producing and consuming public. *This phase of the situation was so clear that the government in effect consented to the temporary injunction.* See Hill v. Wallace, 257 U.S. 310, 42 S.Ct. 168, 66 L.Ed. 253; Id., 257 U.S. 615, 42 S.Ct. 96, 66 L.Ed. 398. Under these extraordinary and most exceptional circumstances, it was held that section 3224 was not applicable to prevent an injunction against collection of such a prohibitive tax imposed for the purpose of regulating the future grain business with all the unnecessary and disastrous consequences its enforcement would entail if the act was unconstitutional. *Hill v. Wallace should, in fact, be classed with Lipke v. Lederer, 259 U.S. 557, 42 S.Ct. 549, 66 L.Ed. 1061, as a penalty in the form of a tax.*" (Italics added.)

And see Reinecke v. Peacock (C.C.A.7, 1924) 3 F.(2d) 583.

█ Nor can we assume jurisdiction on the strength of the allegation that the language of the enactment is not broad enough to incorporate the general provisions for refund of the Revenue Acts. We think it is. Revenue Act 1936, § 322 (26 U.S.C.A. § 322); Ellay Co. v. Bowers (C.C.A.2, 1928) 25 F.(2d) 637; Sheridan Flouring Mills, Inc., v. Cassidy, supra.

█ But assuming that it is not, there is brought into play the principle under which, *in the absence of such provisions,* courts will entertain (on general governmental principles) an action against the collector for the return of the tax. Pacific Steam Whaling Co. v. United States (1903) 187 U.S. 447, 452, 453, 23 S.Ct. 154, 47 L.Ed. 253; Graham v. Du Pont, supra; and see, Matthews v. Rodgers (1932) 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447.

█ Nor is there validity to the claim that the remedy of refund is inadequate because of the failure of the Congress to make any appropriation to pay such refunds as may be allowed. Rieder v. Rogan, supra, 12 F.Supp. 307, at page 313; Cohen v. Durning (D.C.N.Y.1935) 11 F.Supp. 824.

No other questions require consideration.

In the light of what precedes, a temporary injunction will be denied, the temporary restraining order will be dissolved, and the government's motion to dismiss will be granted.

Exception to the plaintiff.